UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

CLINTON TAYLOR,

                Petitioner,                 Case No. 1:07-cv-1140

v.                                       Honorable Gordon J. Quist

JOHN PRELESNIK,

                Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Petitioner is serving two terms of 210 months to 30 years and one term of 100 months to

15 years, imposed by the Allegan County Circuit Court on August 27, 2004, after a jury convicted

Petitioner of two counts of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS

§ 750.520b(1)(b), and one count of second-degree criminal sexual conduct (CSC II), MICH. COMP.

LAWS § 750.520c(1)(b). In his *pro se* petition, Petitioner raises eight grounds for relief, as follows:

I.      THE DEFENDANT WAS UNLAWFULLY DEPRIVED OF THE
EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN TRIAL
COUNSEL FAILED TO RAISE AND PRESERVE THE INSANITY
DEFENSE.

II.     THE TRIAL COURT DEPRIVED THE DEFENDANT OF HIS DUE
PROCESS AND EQUAL PROTECTION RIGHTS TO A FAIR TRIAL
WHEN IT DENIED DEFENSE MOTIONS TO REFER THE DEFENDANT
FOR COMPETENCY EXAM, WHEN IT UNLAWFULLY ADMITTED IN
VIOLATION OF ITS OWN IN LIMINE ORDER BARRED [] PRIOR
ACTS EVIDENCE RELATING TO ANOTHER ALLEGED CHILD
VICTIM OR IN THE ALTERNATIVE PERMITTED THE PROSECUTOR
TO COMMIT UNLAWFUL MISCONDUCT REQUIRING REVERSAL,
AND WHEN IT DENIED HIS MOTION FOR NEW TRIAL.

III.     THE TRIAL COURT UNLAWFULLY DEPRIVED THE [PETITIONER] OF HIS RIGHTS UNDER THE U.S. AND MICHIGAN CONSTITUTIONS TO PRESENT A DEFENSE WHEN IT BARRED HIM FROM INTRODUCING EVIDENCE [OF] A TAPE OF A PHONE CALL BETWEEN HIM AND HIS DAUGHTER IN WHICH SHE STATED NONE OF THE ALLEGED SEXUAL ASSAULT ACTS TOOK PLACE.

IV.      THE TRIAL COURT REVERSIBLY ERRED IN SCORING 15 POINTS ON OV-10 AND IN SCORING 10 POINTS ON OV-19.

V.       THE TRIAL COURT VIOLATED THE UNITED STATES AND MICHIGAN CONSTITUTIONS IN SENTENCING THE DEFENDANT TO A PRISON TERM OF 210 MONTHS TO 30 YEARS ON THE CSC 1 CONVICTIONS AND TO A PRISON TERM OF 100 MONTHS TO 15 YEARS ON THE CSC 2 CONVICTION.

VI.      PROSECUTORIAL MISCONDUCT

VII.     INSUFFICIENCY OF THE EVIDENCE

VIII.    INEFFECTIVE ASSISTANCE OF COUNSEL

Respondent has filed an answer to the petition (docket #7) stating that the grounds should be denied because they are either noncognizable or without merit. Upon review and applying the AEDPA standards, I find that Petitioner's claims are meritless. Accordingly, I recommend that the petition be denied.

**Procedural History**

A.     **Trial Court Proceedings**

The state prosecution arose from Petitioner's multiple sexual assaults of his daughter. Petitioner was charged with two counts of CSC I and one count of CSC II. Petitioner was tried before a jury in a two-day trial beginning July 27, 2004. Prior to trial, the court considered and decided several motions. First, the court heard and denied the prosecution's motion to introduce under MICH. R. EVID. 404(b) other-acts evidence involving a CSC conviction for sexually assaulting

Laura Cutler, a friend of the victim in the instant case. (1/22/04 Hr'g Tr., 2, docket #13.) On March 22, 2004, the court heard a motion to dismiss the case based on the victim's letter retracting her allegations. After taking the victim's testimony, the court revoked Petitioner's bond because he had violated the terms of his bond by contacting the victim and influencing her to write the letter. (3/22/04 Hr'g Tr., 13, docket #15.) On May 21, 2004, the court heard the prosecution's objection to newly substituted defense counsel, who originally had represented the victim, and to Petitioner's motion for new trial. Petitioner's attorney conceded a conflict of interest and withdrew, and the trial was rescheduled. (5/21/04 Hr'g Tr., 6, docket #16.) The prosecutor thereafter filed a new case against Petitioner for witness tampering. Four days before trial, on July 23, 2004, Petitioner's counsel moved for a forensic evaluation of his client, who was experiencing severe anxiety and depression. The court found that defense counsel had not alleged that Petitioner could not understand or participate in the proceedings or that he was unable to communicate with counsel. The court denied the motion, finding that it was part of a pattern of actions taken to delay trial. (7/23/04 Hr'g Tr., 1, 5-6.)

On July 27, 2004, before voir dire began, defense counsel again moved to adjourn the trial and to refer Petitioner to the Forensic Center for evaluation. Counsel renewed his argument that Petitioner was very anxious and troubled and had been placed on suicide watch. (Tr. I, 2.[1]) The court again held that anxiety and nervousness were not relevant to Petitioner's competency to stand trial. Instead, the court reiterated that the key question was whether Petitioner could communicate

<hr />

[1]The transcript of the first day of trial, July 27, 2004, is contained in a single volume (docket #18), hereafter "Tr. I, ___." The transcript of the second day of trial is set forth in two volumes. The first (docket #19) contains the testimony of the remaining witnesses, the jury instructions, the motion arguments, and the verdict. That volume will be designated as "Tr. II, ___." A separate volume (docket #21) contains the closing and rebuttal arguments of the prosecution and defense. That volume will be designated as "Tr. II Supp., ___."

with his attorney, whether he knew what was happening, and whether he could assist in his defense. The court denied the motion, holding that none of the relevant requirements had been met. (Tr. I, 5-6.)

At trial, Ashleigh Nicole Taylor testified that she was 18 years old at the time of trial. In 1998, she was living with Petitioner (her father) and her stepmother, Jennifer Taylor. (Tr. I, 117.) During that year, when Ashleigh was in sixth grade, Petitioner began to molest her. He made her perform oral sex on him and he performed oral sex on her. He also touched her in inappropriate places and, on occasion, put his finger slightly into her vagina. (Tr. I, 118-19, 124.) She testified that it happened two to three times per week from the time she was 12 or 13 years old until she was 16 years old, though it occurred less frequently after she turned 15. (Tr. 120-21.) She remembered one occasion when she wanted to go to a lake. Her father took her into the bathroom and made her perform oral sex before he would take her and others to the lake. (Tr. I, 119.) She remembered another occasion when her stepmother was out of town for work. Petitioner made her sleep in his bed and he performed oral sex on her. (Tr. I, 121.) On yet another occasion, her stepmother came home unexpectedly, entering through the back door near Ashleigh's bedroom. Her stepmother saw Ashleigh naked in Petitioner's presence, though she did not see her father touch her. (Tr. I, 122.) Ashleigh shut her door quickly and nothing was ever said to her. (Tr. I, 122-23.) Usually, the other children were outside and her stepmother was at work when her father molested her. (Tr. I, 126.) She believes her brother Frankie walked in on something one time. (Tr. I, 126.) In addition to occasions in the summer, Ashleigh testified that she frequently was forced to perform oral sex with her father between 3:00 or 3:30 p.m., when she arrived home from school, and shortly after 4:00, when her stepmother arrived home from work. (Tr. I, 133.) According to Ashleigh, if she did not

cooperate with Petitioner, he would do things to her or her siblings, particularly her brother Frankie, who was one year younger than she. (Tr. I, 133.) Petitioner once dragged Ashleigh by her hair into his bedroom so that she could perform oral sex. He also dragged Frankie through the house by his hair or his ear. (Tr. I, 133.) Ashleigh testified that she was worried about her 12-year-old sister being subjected to the same abuse. (Tr. I, 130.) Petitioner required Ashleigh to do sexual favors for him in order to be allowed to stay on the basketball team. (Tr. I, 134.) Petitioner had her play with sex toys and look at pornography. When the first allegations of sexual abuse were made by Laura Cutler, Petitioner had Ashleigh get the bag of sex toys and magazines from the safe and put them into the dumpster. (Tr. I, 135.)

During an investigation of the abuse allegations by Laura Cutler, Ashleigh was interviewed by the authorities. (Tr. I, 126-27.) At that time, because she was afraid, Ashleigh denied that Petitioner had sexually molested her. (Tr. I, 127.) Ashleigh stated that Petitioner had warned her not to say anything. (Tr. I, 128.) Ashleigh also testified that, shortly before she turned 18, she wrote a letter at her father's request, saying that her allegations were lies. She wrote the letter at John and Colleen Elkin's house, where her father was living. She was brought to the house by Sherry Musson, a long-time member of her father's congregation, despite the fact that Petitioner was not supposed to have contact with her. (Tr. I, 128-29, 130, 142, 155.) Petitioner apologized to Ashleigh, and she agreed to write a letter retracting her allegations because she did not want him to go to prison. Her father told her what to write in the letter. (Tr. I, 129.) Sherry then took the letter to the attorney that she had hired for Ashleigh. (Tr. I, 129.)

After her father had been removed from the home during the course of the Laura Cutler investigation, Ashleigh told her stepmother what had happened. (Tr. I, 130.) When her father

was in jail for the Laura Cutler case, she told her biological mother, who had come to visit her. (Tr. I, 159.) She met with her father on another occasion. Her father again apologized and offered her $5,000 to buy a car, while telling her that he did not want to go to jail. She considered it a bribe, and she was torn about what to do. She told him that she was worried about going to jail if she committed perjury by denying what had happened. (Tr. I, 131.) He told her not to worry and that he would appreciate it if she would do that for him. (Tr. I, 131.)

Jennifer Taylor testified that she was married to Petitioner and Ashleigh was her adopted daughter. (Tr. I, 193.) Ashleigh disclosed Petitioner's abuse to Jennifer about a year before trial. Ashleigh told Jennifer not to say anything, however, because she was afraid and did not want to be responsible for sending her father to jail. (Tr. I, 193.) According to Jennifer, Petitioner was employed outside the home until 1997, and he simultaneously devoted his spare time to his ministry. When he lost his job, he went into the ministry full time, so he usually was at home during the day. (Tr. I, 194.) Jennifer testified that she came home early one day and walked in the back door. She saw Ashleigh standing in her bedroom doorway with no top on while Petitioner was talking to her. (Tr. I, 196.) When Jennifer asked what was going on, Petitioner told her that he walked in to talk to Ashleigh and, when he discovered that Ashleigh didn't have a shirt on, they both became embarrassed and continued to talk. Petitioner then yelled at Jennifer for embarrassing Ashleigh. (Tr. I, 196.) After Ashleigh disclosed the sexual abuse to Jennifer, Jennifer tried to get Ashleigh to disclose the abuse to her counselor. Jennifer was concerned that, if she brought the allegations forward, she would put her other children through more court supervision because Ashleigh would be honest with investigators. (Tr. I, 197.) She testified that Petitioner was abusive, controlling, and would throw things and pull people around by their hair and ears. (Tr. I, 199-200.)

Allegan County Sheriff's Department Detective Chris Koster testified that he specialized in the investigation of cases of criminal sexual conduct. (Tr. I, 231.) He testified that his interview of Ashleigh Taylor in August 2003 was conducted according to the protocol established by the Governor's Task Force to avoid leading or influencing children in such cases. (Tr. I, 232.) At the 2003 interview, Ashleigh indicated that she did not want her father to be arrested or to go to prison. She was upset that Koster was even talking to her. (Tr. I, 233.) She disclosed that she had been sexually abused, but she also made it clear that she did not want to proceed with the case. (Tr. I, 234.) After interviewing Ashleigh, Koster spoke with Petitioner. He told Petitioner that he was not to have contact with either Jennifer or Ashleigh. (Tr. I, 234.)

The defense introduced the testimony of Colleen Elkins. Prior to her testimony, Elkins was warned that she had a Fifth Amendment right to remain silent and that her testimony could be used in the future to charge her with witness obstruction or tampering. (Tr. II, 3-4.) Elkins testified that Ashleigh came to Elkins' home while Elkins was not there. When Elkins arrived home, Ashleigh wanted to talk with her. Elkins told Ashleigh that she was upset with her and did not want to talk. According to Elkins, Ashleigh stated that she had lied about her father and wanted Elkins' opinion about what she should do. (Tr. II, 5.) Elkins watched Ashleigh write a letter over the course of a couple of hours. Petitioner was not at the house at the time. Elkins did not read the letter when Ashleigh gave it to her. (Tr. II, 6-7.) Elkins acknowledged that Ashleigh had never been to her house before. (Tr. II, 9.)

At the conclusion of trial, on July 28, 2004, the jury found Petitioner guilty of two counts of CSC I and one count of CSC II. (Tr. II, 40.) After the verdict was returned, defense counsel moved for a mistrial and to set aside the verdict, arguing that the prosecutor had engaged

in improper closing argument. (Tr. II, 41.) Because only stand-in counsel was present to take the verdict, the court directed Petitioner to file a motion. At a hearing held August 13, 2004, the court denied the motion. (8/13/04 Hr'g Tr., 10-11, docket #22.) On August 27, 2004, Petitioner was sentenced to serve two terms of 210 months to 30 years and one term of 100 months to 15 years for the respective convictions. (Sentencing Transcript, (S. Tr.), 18, docket #23.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on October 6, 1995, raised the first five issues raised in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #24.) In a *pro per* supplemental brief on appeal, Petitioner raised the remaining three issues presented in his habeas application. (*See* Def.-Appellant's Supp. Br. on Appeal, docket #24.) Petitioner filed a motion to remand, which was denied by the Michigan Court of Appeals on August 4, 2004. (*See* 8/4/04 Mich. Ct. App. Order, docket #24.) By unpublished opinion issued on May 16, 2006, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 5/16/06 Mich. Ct. App. Opinion (MCOA Op.), docket #24.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same eight claims raised before and rejected by the Michigan Court of Appeals. By order entered January 29, 2007, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #27.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de*

*novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.      Ineffective Assistance of Counsel

In his first ground for habeas relief, Petitioner contends that he was deprived of the effective assistance of counsel when his attorney failed to raise and preserve an insanity defense. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court

considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

The Michigan Court of Appeals addressed the issue as follows:

> Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d (2002). A defendant must overcome the strong presumption that counsel's performance was sound trial strategy. *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001). Decisions regarding what evidence to present are matters of trial strategy, which this Court will not review with the benefit of hindsight. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). This Court will not reverse where the failure to raise an insanity defense is a question of trial strategy. See *People v Lotter*, 103 Mich App 386; 302 NW2d 879 (1981).

> Defendant has not established that he was denied the effective assistance of counsel. Defense counsel's decision to exploit the inconsistencies between the victim's testimony and her written card and letter, and to present a witness to attack the victim's credibility in an effort to persuade the jury that the victim's allegations of abuse were untrue, was a matter of trial strategy. Because the defense of insanity entails a challenge to criminal responsibility for conduct, rather than the conduct itself, the presentation of an insanity defense would have been entirely inconsistent with that strategy. Although a defendant may present inconsistent defenses, see

- 12 -

> *People v Lemons*, 454 Mich 234, 245; 562 NW2d 447 (1997), doing so here would
> have significantly weakened the chosen defense, which, given the victim's initial
> denial of abuse and her later recantation of the allegations against defendant, was a
> wholly reasonable strategy. See *People v LaVearn*, 448 Mich 207, 216; 528 NW2d
> 721 (1995). The fact that the strategy chosen by defense counsel did not work does
> not constitute ineffective assistance of counsel. *People v Stewart (On Remand)*, 219
> Mich App 38, 42; 555 NW2d 715 (1996).

(5/16/06 MCOA Op., 2, docket #26.)

The court of appeals based its decision on Michigan cases that expressly apply the applicable federal standard set forth in *Strickland*, 466 U.S. at 687. *See, e.g., LeBlanc*, 640 N.W.2d at 248 (quoting *Strickland*'s two-pronged test). Moreover, the state court's application of that standard was entirely reasonable. As the court of appeals observed, in order to pursue the insanity defense, counsel would have been forced to effectively concede that the offense conduct occurred, undermining his strategy of attacking the victim's credibility. Given the number of contrary statements given by the victim, the strategy pursued by defense counsel was highly reasonable. Petitioner fails entirely to overcome the presumption that counsel's performance was outside the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. As a result, the state court's determination constituted a reasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(d).

II.     Denial of Competency Examination and Admission of Other Bad Acts

In his second ground for relief, Petitioner asserts that he was denied his rights to due process and equal protection when the trial court denied his emergency motion for a competency examination brought four days before trial. In addition, Petitioner contends that the trial court violated its own court order regarding the admission of prior acts involving another child victim.

## A.    Competency Exam

A criminal defendant who is incompetent may not be tried. *Godinez v. Moran*, 509 U.S. 389, 396 (1993); *Drope v. Missouri*, 420 U.S. 162, 171 (1975). The test for a defendant's competency to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 411 (1960); *see also Godinez*, 509 U.S. at 396; *United States v. Denkins*, 367 F.3d 537, 547 (6th Cir. 2004) (quoting *United States v. Ford*, 184 F.3d 566, 580 (6th Cir. 1999). A court's failure to hold a proper hearing where substantial evidence exists of the defendant's incompetency violates the defendant's due process right to a fair trial. *Mackey v. Dutton*, 217 F.3d 399, 411 (6th Cir. 2000). "[T]he standard . . . for requiring competency hearings prior to trial or the entry of a guilty plea is not merely whether extant evidence raises 'doubt' as to the defendant's capacity to stand trial, but rather whether evidence raises a 'bona fide doubt' as to a defendant's competence." *Warren v. Lewis*, 365 F.3d 529, 533 (6th Cir. 2004). In reaching its determination regarding competency, a court should consider evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion concerning his competence. *Mackey*, 217 F.3d at 411. A state may presume that a defendant is competent to stand trial and require him to proved his incompetency by the preponderance of the evidence, *Medina v. California*, 505 U.S. 437, 449 (1992).

The Michigan Court of Appeals carefully addressed Petitioner's claim:

"A criminal defendant is presumed to be competent to stand trial absent a showing that 'he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner.'" *People v Harris*, 185 Mich App 100, 102; 460 NW2d 239 (1990), quoting MCL 330.2020(1). The test to determine competency to stand trial is "whether the defendant 'has sufficient present ability to consult with his lawyer with

a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'" *People v Belanger*, 73 Mich App 438, 447; 252 NW2d 472 (1977), quoting *Dusky v United States*, 362 US 402; 80 S Ct 788; 4 L Ed 2d 824 (1960). The determination of whether a competency evaluation is necessary to assess such competency is within the trial court's discretion. *Harris, supra.*

In moving for a competency examination before trial, defense counsel represented that defendant "was not as consistent in his mental processes in terms of talking about issues," and that his mental state had declined in comparison to defense counsel's previous visits. These bare, unsupported allegations do not amount to a showing that defendant was unable to assist in his defense or understand the nature and object of the proceedings. *Id.*; see also *Drope v Missouri*, 420 US 162, 177 n 13; 95 S Ct 896; 43 L Ed 2d 103 (1975) (a trial court is not required to accept without question an attorney's representations concerning the competence of his client). Likewise, defense counsel's indication that defendant was apprehensive and depressed does not equate to a finding that defendant was incompetent to stand trial, or even in need of a competency evaluation. The trial court applied the appropriate statutory criteria for determining competency when it denied defendant's motion and, in doing so, properly concluded that defendant had failed to rebut the presumption of competency. On the record before us, the trial court did not abuse its discretion when it denied defendant's motion for a competency evaluation.

(5/16/06 MCOA Op., 2, docket #26.)

The state courts reasonably applied the applicable Supreme Court precedent. Defense counsel did not represent to the trial court that Petitioner was unable to understand or assist in the proceedings or that he could not communicate with counsel. (Tr. 7/23/04 Hr'g, 5-6, docket #17; Tr. I, 5-6, docket #18.) Further, no other evidence in the record indicates that Petitioner had demonstrated a lack of understanding or rationality during the course of the pretrial hearings. In addition, even in his habeas application, Petitioner has never argued that he was unable to understand and assist in the proceedings or to communicate with his attorney. Accordingly, both the state trial court's and court of appeals' decisions constituted reasonable applications of clearly established Supreme Court precedent.

### B.    Prior Bad Acts

At a pretrial hearing held January 22, 2004, the trial court ruled that Petitioner's prior conviction for criminal sexual conduct involving a friend of the complainant in the instant case could only be used for impeachment purposes.  (1/22/04 Hr'g Tr., 2.)  Petitioner argued on appeal and in his habeas petition that the prosecutor nevertheless introduced evidence of the prior offense, in violation of the court's ruling.

The court of appeals concluded that the admission of evidence of prior bad acts was improper under MICH. R. EVID. 404(b).  The court concluded, however, that the error was not preserved, because no contemporaneous objection had been made.  As a consequence, it considered the claim only for plain error.  Because of the limiting instruction given to the jury, the court of appeals found that Petitioner's substantial rights were not affected by the admission of the evidence. (5/16/06 MCOA Op., 3-4.)

To the extent Petitioner raises a claim under Michigan Rules of Evidence 404(b), his claim is not cognizable on habeas review.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.

Moreover, state-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000). Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard. The admission of similar acts testimony under Michigan Rule of Evidence 404(b) violated no traditional and fundamental principle of justice. The United States Supreme Court has declined to hold that the admission of similar "other acts" evidence is so extremely unfair that its admission violates fundamental concepts of justice. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990). Although the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512; *see also Estelle*, 502 U.S. at 70 (holding that admission of prior injury evidence that infant victim suffered from battered child syndrome was relevant to establish

intent in second-degree murder prosecution, and, thus, did not violate due process).  As a result, I recommend that Petitioner's second habeas ground be denied.

### III.  Exclusion of Tape Recording

In his third ground for habeas relief, Petitioner contends that the trial court abused its discretion and deprived him of his right to present a defense guaranteed by the Confrontation Clause when it refused to admit a tape recording made by Petitioner of a telephone conversation with his daughter.  In the conversation, Ashleigh answered Petitioner's questions, saying she had never been hurt or made to feel uncomfortable by him.

Although Petitioner raised the federal constitutional issue in his brief on appeal, the Michigan Court of Appeals addressed the question solely as an issue of state law:

> Defendant next challenges the trial court's refusal to admit a recorded telephone conversation between defendant and the victim, during which the victim acknowledged that she had never been "hurt: or otherwise made to feel "uncomfortable" by defendant.  The trial court denied admission of the recording on the grounds that its nondisclosure by the defense until the first day of trial violated the mutual discovery order in place, and because the probative value of the recording was outweighed by its cumulative effect.  MRE 403.  Defendant argues that the recording was relevant and probative evidence and that its suppression precluded him from presenting his defense at trial.  We review a trial court's decision regarding the appropriate remedy for noncompliance with a discovery order and regarding the admissibility of evidence for an abuse of discretion.  *People v Davie (After Remand)*, 225 Mich App 592, 597-98; 571 NW2d 229 (1997); *Katt, supra* at 389.  However, questions of law related to the admission or exclusion of evidence, including a claim that the defendant was denied his constitutional right to present a defense, are reviewed de novo.  *People v Layher*, 464 Mich 756, 761; 631 NW2d 281 (2001).

> In criminal proceedings a party must, if requested, provide "any written or recorded statement by a lay witness whom the party intends to call at trial."  MCR 6.201(A)(2); see also *People v Holtzman*, 234 Mich App 166, 174; 593 NW2d 617 (1999).  Where a party fails to do so, a trial court may order that testimony or evidence be excluded, or may order another remedy.  See MCR 6.201(J).  Although an abuse of discretion is a high standard that is difficult to overcome, see *People v Ackerman*, 257 Mich App 434, 437-438; 669 NW2d 818 (2003), otherwise admissible evidence should only be excluded in the most egregious cases.  *People*

*v Taylor*, 159 Mich App 468, 487; 406 NW2d 859 (1987).  To fashion a remedy, "the court must 'determine the legitimate interests of the court and the parties involved and how they may be affected by the remedial choices available.'"  *People v Clark*, 164 Mich App 224, 229; 416 NW2d 390 (1987), quoting *People v Taylor*, 159 Mich App 468, 484; 406 NW2d 859 (1987).  This discretion requires an inquiry into all the relevant circumstances, including the causes of the noncompliance, as well as a showing by the objecting party of actual prejudice.  *Davie, supra* at 598.

     The trial court's suppression of the recording did not constitute an abuse of discretion.  The trial court considered the circumstances and the effect of its ruling on the parties.  The prosecution had already received discovery materials after the deadline, and the defense previously engaged in delaying tactics.  Moreover, the recording at issue was not mentioned to the prosecution until the middle of the victim's cross-examination.  The trial court thus had legitimate reasons for excluding the recording from trial on the basis of a discovery violation.

     The trial court also properly denied admission of the recording under the rules of evidence.  The recorded phone conversation was relevant to the present case because it contains the victim's denial that defendant had ever touched her sexually.  MRE 401.  While relevant evidence is generally admissible unless otherwise precluded, MRE 402, relevant evidence may be excluded if it is cumulative evidence.  MRE 403.  The record supports the trial court's conclusion that the recording's contents were cumulative in nature.  The recording served the same impeachment purpose as the previously admitted letter.  Further, the probative value of the recording was limited because, although explaining that she did so only because she was frightened, the victim admitted at trial that she participated in telephone conversations with defendant during which she acknowledged that defendant never "hurt" or made her feel "uncomfortable."  It was not an abuse of discretion to preclude the evidence.

(Pet. Br. on Appeal, 5-6, docket #26.)

     To the extent Petitioner claims that the trial court's decision violated Michigan law or the Michigan Rules of Evidence, his claim is not cognizable on federal habeas corpus review.  *See* 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68.  As previously discussed, state-court evidentiary rulings do not implicate due process unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour*, 224 F.3d at 552.

Because the state court did not consider the federal constitutional issue, this Court applies *de novo* review. *See Wiggins*, 539 U.S. at 534; *Maples*, 340 F.3d at 437. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations and internal quotations omitted); *see also Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006); *California v. Trombetta*, 467 U.S. 479, 485 (1984). The Supreme Court, however, repeatedly has recognized that the right to present a defense is subject to reasonable restrictions. *See United States v. Scheffer*, 523 U.S. 303, 308 (1998) (addressing the exclusion of exculpatory polygraph test result); *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (the Sixth Amendment does not confer on the accused an "unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence"); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973).

> "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve. Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

*Scheffer*, 523 U.S. at 308 (internal citations omitted). When inquiring into the constitutionality of a trial court's decision to exclude evidence, a habeas court must consider the relevancy and cumulative nature of the excluded evidence, and the extent to which it was "indispensable" to the defense. *Crane*, 476 U.S. at 691. Against this courts must balance the state's interests in enforcing the evidentiary rule on which the exclusion was based. *Id.*

Here, the state court rule unquestionably was proportionate and reasonable to the state interest. Petitioner failed to comply with the mutual discovery order for the second time during the course of trial. As the trial court found, the Petitioner's failure to disclose the existence of the tape recording was part of a defense pattern of "trial-by-ambush" that ignored the legitimate orders of the court. (Tr. I, 173.) The trial court's factual finding is reasonable and is entitled to a presumption of correctness, which Petitioner makes no attempt to rebut. *See* 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. Moreover, the tape recording was not indispensible to Petitioner's case. The complaining witness had previously acknowledged that she had, on multiple occasions, denied that Petitioner had abused her. (Tr. I, 127, 147-48, 150-52, 154.) She admitted to the content of the recorded conversation. (Tr. I, 152.) Further, she admitted to having written a detailed letter retracting her allegations, which was introduced into evidence at trial. (Tr. I, 137-41.) As a result, the witness's conflicting statements were fully presented to the jurors, and defense counsel vigorously argued that the conflicts undermined the complainant's credibility. As a result, the tape recording was cumulative, and its exclusion fell far short of depriving Petitioner of his right to present a defense. *Scheffer*, 523 U.S. at 308.

IV.    Sentencing Errors

In grounds four and five of his habeas application, Petitioner raises claims of sentencing error. In ground four, Petitioner contends that the state court improperly calculated the sentencing guidelines by scoring 15 points on Offense Variable (OV)-10 and 10 points on OV-19. Petitioner argues that the court violated both Michigan law and the Sixth and Fourteenth Amendments by increasing his sentence based on facts that were neither found by a jury nor admitted by Petitioner, contrary to *Blakely v. Washington*, 542 U.S. 296 (2004). In ground five,

Petitioner contends that the sentencing court failed even to consider imposing a maximum sentence of less than 30 years on the CSC I convictions, thereby violating state law and the Eighth Amendment's prohibition on cruel and unusual punishment.

### A.    Scoring of Offense Variables

Petitioner contends that he was improperly assessed 15 points under OV-10, for predatory conduct, MICH. COMP. LAWS § 777.40(1)(a), rather than 10 points for the exploitation of a victim's domestic relationship, MICH. COMP. LAWS § 777.40 (1)(b).  He also argues that he should not have been assessed 10 points under OV-19 based on interference with the administration of justice.  *See* MICH. COMP. LAW § 777.49(c).

There is no constitutional right to individualized sentencing in non-capital cases. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (in a case holding that mitigating factors must be fully considered in death penalty cases, the Court "recognize[d] that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes.").  Since Petitioner has no federal right to an individualized sentence, this ground presents an issue of state law only.  Petitioner's sentence was well within that authorized by state law.  Petitioner has not alleged grounds for the Court to conclude that this is one of those rare instances where an alleged state-law sentencing error was so egregious that it led to a fundamentally unfair outcome.  *See Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)).

## B.    *Blakely* Error

Petitioner next argues that the trial court judge violated his Sixth and Fourteenth Amendment rights by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable doubt.  Petitioner bases his argument on the United States Supreme Court holding in *Blakely*, 542 U.S. 296.  *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge.  Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant.  The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt.  *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term.  The maximum sentence ordinarily is not determined by the trial judge, but is set by law.  *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8).[2]  Only the minimum sentence is based on the applicable sentencing guideline range.  *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)).  The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely.  See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th

---

[2]The maximum sentence for the offense of CSC I is imprisonment for life or any term of years.  *See* MICH. COMP. LAWS § 750.520b(2)(a).

Cir. Nov. 10, 2009) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007). Therefore, the state court's determination of Petitioner's *Blakely* claim based on the scoring of sentencing variables, which affects only the minimum sentence, was neither contrary to nor an unreasonable application of federal law clearly established by the United States Supreme Court.

In ground five, Petitioner argues that the state court violated *Blakely* by not considering setting the maximum sentence lower than 30 years. Petitioner contends that factors such as his strong family support and his diagnosed mental illness should have resulted in a lower maximum sentence. Petitioner's argument regarding the maximum sentence does not implicate *Blakely*. The maximum sentence set by the legislature for CSC I is life imprisonment or any term of years set by the court. *See* MICH. COMP. LAWS § 750.520b(2)(a). As a result, no finding of fact could have resulted in a sentence higher than the statutory maximum. Petitioner had no Sixth Amendment right to have the sentencing judge set his maximum sentence lower than life imprisonment, much less to have it set lower than the 30 years Petitioner received.

### C.    Eighth Amendment

Petitioner next asserts that his sentence amounts to cruel and unusual punishment under the Eighth Amendment. The Michigan Court of Appeals rejected the claim, concluding that, because the sentence was within the applicable guidelines ranges, it necessarily was proportionate and did not amount to cruel and unusual punishment. (5/16/06 MCOA Op., 7.)

The United States Constitution does not require strict proportionality between a crime and its punishment. *Harmelin*, 501 U.S. at 965; *United States v. Marks*, 209 F.3d 577, 583 (6th Cir.

2000).  "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment."  *Marks*, 209 F.3d at 583; *see also Lockyer v. Andrade*, 538 U.S. 63, 77 (2003) (gross disproportionality principle applies only in the extraordinary case); *Ewing v. California*, 538 U.S. 11, 36 (2003) (principle applies only in "'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality'") (quoting *Rummel v. Estelle*, 445 U.S. 263, 285 (1980)).  A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'"  *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  Ordinarily, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole."  *Thomas*, 49 F.3d at 261.  Petitioner was not sentenced to death or life in prison without the possibility of parole, and his sentence falls within the maximum penalty under state law.  Petitioner's sentence does not present the extraordinary case that runs afoul of the Eighth Amendment's ban of cruel and unusual punishment.  The state court's determination therefore was entirely reasonable.

## V.    Prosecutorial Misconduct

In his sixth ground for habeas relief, Petitioner argues that the prosecutor committed misconduct by introducing prior uncharged acts, by arguing evidence not introduced at trial, and by commenting on Petitioner's decision not to testify.

For habeas relief to be granted, the prosecutorial misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due

process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The Court has emphasized a series of factors to be evaluated in determining whether prosecutorial misconduct so infected the trial as to amount to a violation of due process: (1) whether the comments were isolated or pervasive, (2) whether they were deliberately or accidentally placed before the jury, (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence, (5) the strength of the overall proof establishing guilt, (6) whether the remarks were objected to by counsel and (7) whether a curative instruction was given by the court. *See Darden*, 477 U.S. at 182-83; *United States v. Young*, 470 U.S. 1, 12-13 (1985); *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

The Michigan Court of Appeals rejected Petitioner's claim of prosecutorial misconduct as follows:

> Next, in his brief filed in propria persona pursuant to Standard 4 of Administrative Order 2004-6, defendant asserts several additional instances of prosecutorial misconduct. We have reviewed the numerous alleged instances of misconduct and find each to be without substantive merit. Defendant has not demonstrated the existence of prosecutorial misconduct requiring reversal. Additional, because defense counsel is not required to make futile objections, we reject defendant's claim that his trial counsel provided ineffective assistance by failing to object to these alleged instances of prosecutorial misconduct. See *People v Wilson*, 252 Mich App 390, 397; 652 NW2d 488 (2002).

(5/16/06 MCOA Op., 7, docket #26.)

## A.     Introduction of Other Bad Acts

Petitioner first argues that the prosecutor improperly introduced evidence of other acts of criminal sexual conduct against another victim and evidence about incidents of Petitioner's violence against the victim, her stepmother, and her siblings. As previously discussed, no

established Supreme Court authority deems the admission of other-acts evidence unconstitutional. *See Bugh*, 329 F.3d at 512. As a result, the state court's rejection of Petitioner's claim was neither contrary to nor an unreasonable application of established Supreme Court authority.

### B. Facts Not in Evidence

Petitioner next argues that the prosecutor committed misconduct by questioning Jennifer Taylor about Petitioner's repeated telephone calls to the victim in the prior case, some of which apparently were recorded. Specifically, counsel inquired whether Petitioner had mentioned during these record conversations that Ashleigh eventually would make allegations that Petitioner had sexually abused her. (Tr. I, 229.) Defense counsel objected to questioning about the tapes on the basis that it was beyond the scope of sur-rebuttal and because such tapes had not been produced during discovery. The court overruled the objection because it was part of the Family Court matter. (Tr. I, 230.) The prosecutor again referred to the evidence during his closing argument, noting that the evidence explained how social services became involved with her family. (Tr. II, 3.) Petitioner asserts that the prosecutor's remarks constituted improper reference to facts not in evidence.

A prosecutor's statement in a closing argument is improper if the statement brings to the jury's attention purported facts that are not in evidence and are prejudicial. *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995) (citing *Berger*, 295 U.S. at 88). Like other prosecutorial misconduct, the court must first consider whether the comments were improper. *See Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006). If so, such comments warrant habeas relief only if "the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process violation." *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir.

1999) (citing *Donnelly*, 416 U.S. at 643-45), *abrogated on other grounds by* 28 U.S.C. § 2261; *see*

*Mackey*, 217 F.3d at 406.

Contrary to Petitioner's argument, the prosecutor asked questions that elicited actual evidence of Petitioner's statements in the earlier case, even though that evidence was introduced through the testimony of Petitioner's wife, rather than through the introduction of a tape recording. As a result, the prosecutor's question and his comment on the witness' answer did not introduce facts not in evidence. The prosecutor's question and argument, therefore, did not amount to misconduct, much less misconduct rising to the level of a due process violation. Moreover, although the admission of the evidence arguably could have been subject to an objection regarding evidence of similar bad acts, the admission of such acts does not implicate an established constitutional concern. *See Bugh*, 329 F.3d at 512. Petitioner's second claim of prosecutorial misconduct therefore is meritless.

## C. Failure to Testify

In his third argument regarding prosecutorial misconduct, Petitioner contends that the trial court erred when it denied his motion for mistrial based on the prosecutor's improper attack on his right to remain silent. The prosecutor concluded his closing argument with the following statement:

> Between 1998 and 2002 up to 3 times a week, maybe more, this man sexually molested his daughter. His daughter. It happened in Watson Township, Allegan County. What did he do? He forced her to perform oral sex on him. What did he do? He performed oral sex on her. What did he do? He felt her up, he molested her with his hands. That's not in dispute. No one took the stand, no one took the stand and said it didn't happen. Not one single person.

(Tr. II Supp., 8.) Thereafter, in his rebuttal, the prosecutor stated:

Do you know what we didn't hear? He didn't do it. This isn't a trial about trial strategy. It isn't about what Jennifer (sic) wrote here, it's about what came from the witness stand.

Blame. Have you heard that? Have you seen how the shifting has went [sic] on? Read this letter ladies and gentlemen, blame. Read it. Blame. Blame. Blame. Blame. Blame the prosecutor, blame the defense attorney, blame Jennifer (sic). Blame these people. But what we didn't hear is I didn't do it. What we didn't hear is that he didn't do it. The only thing we have heard is that he did it. That is the only thing we have heard. We have heard it from Ashleigh over and over and over again. She took the stand, she was subject to cross examination, and she said yeah, I lied, I lied, I wrote this and I lied. And why. Then you look at the tone of this letter, that's why I wanted it to come in. Look at the tone of the letter. Blame, blame, blame, blame. Those aren't the words of a girl, those are words of an angry defendant. Angry because he was about to get out of jail, he was about to escape and he was caught again. Angry that he was thrown in that trap again.

(Tr. II Supp., 30-31, docket #21.)

The Fifth Amendment prohibits a prosecutor from commenting on a defendant's refusal to testify. *See Griffin v. California*, 380 U.S. 609, 614 (1965). Determining whether a prosecutor's comment violates the Fifth Amendment requires analysis of content and context. *Webb v. Mitchell*, 586 F.3d 383 (6th Cir. 2009). The Sixth Circuit focuses in particular on four of the *Darden* considerations in evaluating a prosecutor's remarks concerning a defendant's failure to testify: (1) whether the prosecutor "manifestly intend[ed]" to comment on the defendant's Fifth Amendment right or would a jury "naturally and necessarily" interpret the remark that way; (2) whether the comment was isolated or part of an extensive pattern; (3) the strength of the prosecution's other evidence; and (4) whether the judge gave a curative instruction. *Id.* (citing *Bowling*, 344 F.3d at 514).

With respect to the first factor, as the state court found, the prosecutor's remark during closing argument about the uncontroverted nature of the victim's story did not manifest an intent to comment on Petitioner's exercise of his Fifth Amendment rights. The remark can be read

as a reference to the weight of the evidence, and a jury could properly hear the argument that way. Indeed, the prosecutor's remark followed a summary of the evidence, including Ashleigh's contradictory statements, and a discussion of her credibility in the context of defense suggestions that she was manufacturing the charges.

The prosecutor's rebuttal comments, as the state court also recognized, were made in response to defense counsel's closing argument, which attempted to deflect the central question of Petitioner's guilt with claims that relevant witnesses had not been called and tape-recorded statements had not been produced. The prosecutor pointed out that the issue was not whether the prosecution's trial strategy should have been different or what Ashleigh wrote in the letter. Instead, the question the jury had to decide turned on the evidence introduced at trial – Ashleigh's unwavering testimony about Petitioner's sexual abuse. The prosecutor then emphasized that the defense theory was always to blame someone, and he argued that that theory was consistent with the tone of the letter written by Ashleigh, which she claimed was dictated by Petitioner. As with the comment during the prosecutor's initial closing argument, the remarks were not clearly and unequivocally an attack on Petitioner's exercise of his constitutional right; they were a response to the closing arguments of the defense.

With respect to the second factor, the prosecutor's trial conduct and initial closing argument did not demonstrate a pattern of misconduct. In fact, the first remark was not made until the last paragraph of the prosecutor's closing argument. Further, the rebuttal comments were of a different nature altogether, and were clearly responsive to the closing argument of the defense. As a result, the remarks do not support a finding of pervasiveness.

The third factor – the strength of the overall evidence – does not preponderate either way.  While the prosecutor's case primarily rested on Ashleigh's testimony, that testimony was detailed and powerful.  Ashleigh frankly admitted having denied abuse on a variety of occasions and offered a credible explanation for her differing statements.

With respect to the fourth factor, the trial court clearly and strongly instructed the jury regarding Petitioner's Fifth Amendment rights:

> Every defendant has the absolute right not to testify.  When you decide the case, you must not consider the fact that he did not testify.  It must not affect your verdict in any way.

(Tr. II, 21.)  In addition, the court advised the jury that the "lawyer's statements and arguments are not evidence.  They are only meant to help you understand the evidence and each side's legal theories."  (*Id.*)

Finally, another of the *Darden* factors is whether the matter was subject to an objection.  Although defense counsel moved for a mistrial after the jury returned its verdict, he did not object to the prosecutor's remarks at the time they were made.  The failure to object prevented the court from further mitigating any possible harm prior to the jury's deliberations.  That factor also counsels against a finding of prosecutorial misconduct.

Taken together, the prosecutor's remarks about Petitioner's failure to testify did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.  The state court therefore reasonably determined that Petitioner's assertions of error failed to rise to the level of prosecutorial misconduct.

### D.      Misrepresentation of Facts

Petitioner argues that the prosecutor repeatedly misrepresented the facts during trial, in his opening statement, and in his closing argument. He contends that the prosecutor asked leading questions about Petitioner's prior statement to the victim in the earlier case regarding his expectation that Ashleigh eventually would make allegations against him. (Tr. I, 226-27.) Petitioner also asserts that the prosecutor characterized him as guilty during the trial by calling Ashleigh "the victim" rather than "the complainant." In addition, Petitioner contends that the prosecutor, in his opening statement, bolstered the complainant's credibility by stating, "But, what she will tell you also is that everything that she's told the police, everything that she will tell you is the truth." (Tr. I, 105-06.) Similarly, he argues that the prosecutor vouched for the complainant's credibility in closing, presumably by stating, "She's not lying." (Tr. II Supp., 7, docket #21.)

The federal courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)). The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility. *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955).

Petitioner's claims regarding the misrepresentation of evidence and vouching clearly are meritless. The prosecutor's characterization of the evidence amounted to fair comment supported by the record. Moreover, the prosecutor's remark during the opening statement did not offer the prosecutor's opinion at all – it merely informed the jury what the victim was expected to say. The comment, therefore, was not improper. *See Slagle*, 457 F.3d at 515-16 (before considering whether prosecutorial misconduct is sufficiently flagrant to violate due process, the court must first conclude that the conduct was improper). Similarly, the prosecutor's statement during closing argument that the victim was not lying was merely a conclusion based on the evidence outlined by the prosecutor immediately preceding the statement. *See Cristini v. McKee*, 526 F.3d 888, 901-02 (6th Cir. 2008) (holding that it is not misconduct for a prosecutor to refer to the defendant's alibi witnesses as "liars" when the prosecutor argues from the evidence to contend that each person's testimony should not believed) (citing *Young* 470 U.S. at 11); *see also Givens v. Yukins*, No. 98-2429, 2000 WL 1828484, at *7 (6th Cir. Dec. 5, 2000) (referring to the petitioner as a liar, thief, drug kingpin, and prostitute in closing argument did not constitute prosecutorial misconduct when the prosecutor's comments were supported by evidence admitted at trial).

In addition, even assuming the prosecutor in some manner erred, Petitioner failed to object to any portion of the prosecutor's allegedly improper statements. *Darden*, 477 U.S. at 182-83. Further, the court clearly instructed the jury that the lawyers statements, arguments, and questions to witnesses were not evidence. (Tr. II, 21.)

In sum, the state court's determination that Petitioner's prosecutorial misconduct claims were without merit is neither contrary to nor an unreasonable application of established Supreme Court precedent.

- 33 -

VI.    Insufficiency of Evidence

In his seventh ground for habeas relief, Petitioner contends that the evidence was insufficient to support his convictions. A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The court of appeals recognized that Petitioner claimed to raise a challenge to the sufficiency of the evidence, but concluded that, because Defendant's claim was based on arguments about the victim's credibility, his challenge actually amounted to a claim that the verdict was against the great weight of the evidence. Applying plain error review to the unpreserved claim, the court rejected Petitioner's argument. (5/16/06 MCOA Op., 7-8, docket #26.)

The implicit finding behind the state court's analysis is that Petitioner failed to articulate a plausible claim of insufficiency under the federal standard. That determination is entirely reasonable. *See Harris*, 212 F.3d at 943 (holding that the standard for reviewing a state-court decision that did not articulate its reasons nevertheless was entitled to deferential review).

Petitioner's argument rests solely on the victim's lack of credibility. As the state court recognized, in evaluating a sufficiency claim, a court may not consider the credibility of witnesses. *Herrera*, 506 U.S. at 401-02. Petitioner's arguments about Ashleigh's lack of credibility were squarely before the jury, which rejected Petitioner's interpretation. Ashleigh clearly testified that her father had improperly touched her breasts, inserted his finger into her vagina, and forced her to engage in oral sex on numerous occasions when her age was between 13 and 15 years. That testimony, if believed, satisfied all the elements of CSC I and CSC II, as charged by the prosecution. (*See* Tr. II, 26-27 (stating the elements of CSC I and CSC II).) Accordingly, sufficient evidence supported the verdicts. The state court's determination was neither contrary to nor an unreasonable application of established Supreme Court precedent.

VII.   Ineffective Assistance of Counsel

In his final ground for habeas relief, Petitioner argues that his trial counsel provided constitutionally ineffective assistance by routinely failing to object to prosecutorial misconduct and propensity evidence, failing to raise and preserve an insanity defense, and failing to preserve a claim that the verdict was against the great weight of the evidence.

As previously discussed, in reviewing a claim of ineffective assistance of counsel, this Court applies the two-part standard set forth in *Strickland*, 466 U.S. at 687-88: (1) whether counsel's performance fell below an objective standard of reasonableness; and (2) whether counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.*

The Michigan Court of Appeals applied the federal constitutional standard and found that counsel's failure to raise the insanity defense amounted to entirely reasonable defense strategy.

(5/16/06 MCOA Op., 3.)  As previously concluded, *supra,* that determination was fully supported on the record and consistent with established federal precedent.

With respect to his claim that counsel failed to object to the introduction of propensity evidence, Petitioner cannot demonstrate the necessary prejudice to prove his claim of ineffective assistance.  The court of appeals found that the evidence was improperly admitted under MICH. R. EVID. 404(b).  The court, however, found that Petitioner's substantial rights were not impaired by the error because the trial court had "specifically instructed the jury that it could not convict [Petitioner] of the charged offenses based on his other bad conduct." (5/16/06 MCOA Op., 4.)  That finding was entirely reasonable, given the length and explicitness of the trial court's instruction.

In addition, allowing the prior act into evidence was part of defense counsel's reasonable trial strategy.  Counsel could not simultaneously exclude all evidence of the prior CSC charge against Petitioner while introducing evidence of Ashleigh's statements made during the course of the investigation and punishment on those charges.  As discussed earlier, counsel's strategy – attacking Ashleigh's credibility based on her multiple conflicting statements – was both presumptively reasonable and reasonable under the circumstances.  Petitioner therefore also fails to demonstrate that counsel's performance fell below an objective standard of reasonableness under *Strickland*.  For both reasons, he fails to demonstrate that counsel rendered constitutionally ineffective assistance.

Moreover, the Michigan Court of Appeals rejected Petitioner's claim that counsel was ineffective in failing to move for a new trial based on the weight of the evidence:

> Finally, because such motion would, as discussed above, have been meritless, defendant was not denied the effective assistance of counsel when his trial counsel

failed to raise and preserve a motion for a new trial based on a claim that the jury's verdict was against the great weight of the evidence. "Ineffective assistance of counsel cannot be predicated on the failure to make a frivolous or meritless motion." *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003).

(5/16/06 MCOA Op., 8.) The state court's ruling was a reasonable application of *Strickland*. The state court, applying state law, concluded that a motion for new trial was not supported by the record. As a result, counsel's failure to object did not amount to ineffective assistance. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010) (recognizing that an attorney's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007) (same).

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  February 8, 2011                                    /s/ Hugh W. Brenneman, Jr.
                                                            HUGH W. BRENNEMAN, JR.
                                                            United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).